1 HANSON BRIDGETT LLP
  NEAL L. WOLF, SBN 202129
2 nwolf@hansonbridgett.com
  ANTHONY J. DUTRA, SBN 277706
3 adutra@hansonbridgett.com
  425 Market Street, 26th Floor
4 San Francisco, California 94105
  Telephone:    (415) 777-3200
5 Facsimile:    (415) 541-9366

6 *Proposed Attorneys for Debtor and Debtor in Possession*

7

8 **UNITED STATES BANKRUPTCY COURT**

9 **NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

10

| 11 | In re | Case No. 21-40363 |
| 12 | CALIFORNIA-NEVADA METHODIST HOMES, | Chapter 11 |
| 13 | Debtor. | **DECLARATION OF STEVEN A. NERGER IN SUPPORT OF "FIRST DAY MOTIONS"** |
| 14 | | |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17350755.3

DECLARATION OF STEVEN A. NERGER ISO "FIRST DAY MOTIONS"

I, Steven A. Nerger, hereby declare as follows:

1. I am an adult and am competent to make this Declaration.

2. I am a partner in the firm of Silverman Consulting, a management and restructuring consulting firm that is based in Skokie, Illinois. I am a registered Certified Public Accountant and have been with the firm of Silverman Consulting for over 32 years, since 1988. Before joining Silverman Consulting, I spent six years with the firm of Arthur Andersen & Company.

3. In my three-plus decades of experience in this industry, I have provided a full range of crisis management services to distressed companies throughout the country, including but not limited to interim management and debtor advisory work, and bankruptcy preparation and management. I have also served as chief restructuring officer in a number of complex transactions including, among others, an indoor water park resort, a supplier of publications for the business and visitor industry and an international supplier of flower bulbs.

4. I am the Chief Restructuring Officer of California-Nevada Methodist Homes, a California non-profit corporation (the "**Debtor**" or "**CNMH**").

5. I have served as the Debtor's Chief Restructuring Officer since February 23, 2021. Since that date, I have worked diligently to become familiar with the Debtor's history, structure, business, day-to-day operations, and financial affairs.

6. Except as otherwise indicated, the statements that I make in this Declaration are based upon (a) my personal knowledge of the Debtor's history, structure, business, day-to-day operations, and financial affairs, (b) information that I have learned from a review of relevant documents and records, and/or (c) information that was supplied to me by other members of the Debtor's management team.

7. I have been authorized to make and submit this Declaration on behalf of the Debtor.

8. If I am called to testify in this Chapter 11 Case, I could and would testify competently to the matters set forth in this Declaration.

DECLARATION OF STEVEN A. NERGER ISO "FIRST DAY MOTIONS"

9.      CNMH is a not-for-profit corporation that operates two continuing care retirement communities (a "**CCRC Facility**", and collectively, the "**CCRC Facilities**").  One of the CCRCs, known as Lake Park, is located in Oakland, California.  The other CCRC, known as Forest Hill, is located in Pacific Grove, California.  Lake Park has 155 residents.  Forest Hill has 70 residents.

10.     CNMH has a total of 223 employees.  Lake Park has 117 employees.  Forest Hill has 90 employees.  The corporate office, located in Oakland, has 16 employees.

11.     A number of the Lake Park employees are members of the SEIU Local 2015 union.

12.     CNMH has been in business for close to 70 years, since 1954.

13.     A CCRC is a community that offers multiple levels of care (a "continuum of care") on a single campus.  It is designed to allow residents to stay in essentially the same place, among the same neighbors and friends, as their health changes and need for assistance grows.   A CCRC, such as CNMH, offers four levels of care including independent living, assisted living, memory care, and skilled nursing and rehabilitation.

14.     CNMH is understandably subject to multiple tiers of government regulation and oversight.  Its "regulators" include, without limitation, the California Department of Social Services ("**DSS**"), the Office of Statewide Health Planning and Development of the State of California ("**Cal-Mortgage**"), and the California Health Facilities Financing Authority (the "**Authority**").

15.     In recent years, CNMH has faced a growing number of financial challenges.  These challenges have resulted from, among other contributing factors, changing attitudes of seniors towards institutional care, the difficulty that smaller CCRCs like CNMH have in achieving "economies of scale" from purchasing and pricing standpoints, direct competition from nearby communities, and the devastating impact of the COVID-19 pandemic.

16.     These challenges have directly led to the commencement of this Chapter 11

DECLARATION OF STEVEN A. NERGER ISO "FIRST DAY MOTIONS"

17350755.3

Case.

**<u>FIRST DAY MOTIONS</u>**

**<u>MOTION OF DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS (I)
AUTHORIZING USE OF CASH COLLATERAL; (II) GRANTING ADEQUATE
PROTECTION; AND (III) SCHEDULING FINAL HEARING</u>**

17.     On or about October 1, 2015, the Authority, a public instrumentality of the State of California, issued $32,920.000 in revenue bonds (the "**Bonds**") at the request of the Debtor.  In connection with the issuance of the Bonds, the Authority entered into an Indenture Agreement with Wilmington Trust, National Association ("**Wilmington**"), under which Wilmington became the indenture trustee for the Bonds and representative of the bondholders.

18.     Also on or about October 1, 2015 the Debtor and various counterparties entered into a series of related transactions in connection with the issuance of the Bonds. First, the Authority and Debtor entered into a Loan Agreement under which the Authority agreed to lend the proceeds from the sale of the Bonds to the Debtor, and in return Debtor agreed to make payments to Wilmington for the payment of interest and repayment of principal to the holders of the Bonds. Second, the Debtor, the Authority, and Cal-Mortgage, a separate instrumentality of the State of California, entered into a "Contract of Insurance" whereby Cal-Mortgage agreed to insure Debtor's repayment of the Bonds. Fourth, the Debtor executed two separate deeds of trust (the "**Deeds of Trust**"), under which it agreed to give Cal-Mortgage and the Authority a security interest in Debtor's two CCRC Facilities and other collateral (collectively, the "**Collateral**"), including, among other things, "[a]ll accounts, accounts receivable and other rights to payment of money now owned or hereafter acquired" by the Debtor, including "deposit accounts." Fifth, the Authority assigned its rights under the Loan Agreement, the Contract of Insurance, and the Deeds of Trust to Wilmington. Sixth, Debtor, Cal-Mortgage, and Wilmington entered into a Deposit Account Control Agreement with respect to Debtor's bank accounts. And Seventh, Cal-

3

DECLARATION OF STEVEN A. NERGER ISO "FIRST DAY MOTIONS"

17350755.3

Mortgage and Wilmington filed a UCC-1 financing statement noting of record their security interest in the Collateral.

19. The net effect of these interrelated transactions is that (1) the Debtor borrowed $32,920,000 in proceeds from the issuance of the Bonds (the "**Bond Debt**"); (2) Debtor agreed to repay the $32,920,000 Bond Debt together with interest to Wilmington; (3) Cal-Mortgage agreed to guarantee Debtor's repayment of the Bond Debt to Wilmington; and (4) Debtor granted a security interest in its cash to Cal-Mortgage and to Wilmington to secure Debtor's repayment of the Bond Debt.

20. The Bonds currently accrue interest at an annual interest rate of 5%. Interest is paid to the holders of the Bonds semi-annually on January 1 and July 1 of each year. A portion of the Bonds mature annually on July 1 of each year until 2026, and thereafter a portion of the Bonds matures on July 1 in 2030, 2035, and 2045. The principal amount that matures on July 1, 2021 is $630,000. Based on the current outstanding principal balance of $30,225,000, the semiannual interest payment for the Bonds on July 1, 2021 will be $755,625. Pursuant to the terms of the Loan Agreement, the Debtor is responsible for making monthly payments to Wilmington sufficient to cover 1/6 of the upcoming semi-annual interest payment and 1/12 of the principal balance scheduled to mature on the following maturity date. The Debtor has not made monthly payments on the Bond Debt since February 2020. As a result, Wilmington has drawn down on a reserve fund established when the Bonds were issued (the "**Bond Reserve Fund**"). The balance of the Bond Reserve Fund as of February 28, 2021 was $785,120.80, meaning that the Bond Reserve Fund is sufficient to cover the semi-annual interest payment on July 1, 2021 and a portion of the principal balance that will mature on July 1, 2021, but the Bond Reserve Fund is insufficient to cover approximately $600,000 of the principal repayment due on July 1, 2021.

21. I believe, absent the immediate and continued use of cash collateral, the Debtor will be unable to operate its business during the Chapter 11 Case, irreparably harming the Debtor's residents, creditors, and other parties in interest. If the Debtor is

4

DECLARATION OF STEVEN A. NERGER ISO "FIRST DAY MOTIONS"

17350755.3

unable, on a consistent basis, to maintain its business and demonstrate financial stability to existing and future residents, the Debtor will lose existing residents, key employees, and vendors, will be unable to attract new residents and will ultimately be forced to cease operations. This will cause harm to the Debtor, but also to its residents who expect a continuum of quality care, potentially leaving residents without food, medical supplies, proper medical care, and other services they require. Therefore, the Debtor's immediate access to cash collateral is necessary to preserve and maximize the value for the benefit of all parties in interest. Thus, the use of cash collateral is essential to Debtor's continued ability to operate, maintain the value of its assets and properly care for its residents until consummation of a plan.

22.     The Debtor has an immediate and critical need to use cash collateral in accordance with the 13-week budget ("**Budget**") which is attached to this Declaration as **Exhibit 1**. I have carefully overseen the preparation of this Budget and believe it to be reasonable, conservative, and appropriate. The Budget covers, among other items, employee wages and salaries, employee benefits, utilities, taxes, pharmacy items, food, and payments to vendors who in the judgment of the Debtor's management, provide the essential goods and services needed to operate and maintain the Debtor's business. In addition, the Debtor requires the use of cash collateral to retain and pay costs of professionals, consultants and advisors who will enable the Debtor to reorganize the Debtor or, if appropriate, market the Debtor for potential sale, in a manner that maximizes value for the Debtor's estate and its creditors, as may be approved by the Court. Taken together, the services provided by all of the foregoing parties and other entities are critical to the preservation of the Debtor's business and asset value.

**MOTION OF DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING CONTINUED USE OF THE DEBTOR'S CASH MANAGEMENT SYSTEM AND BUSINESS FORMS; (II) WAIVING CERTAIN REQUIREMENTS OF THE UNITED STATES TRUSTEE; AND (III) GRANTING RELATED RELIEF**

23.     In the ordinary course of business, the Debtor maintains an integrated,

17350755.3

DECLARATION OF STEVEN A. NERGER ISO "FIRST DAY MOTIONS"

centralized cash management system (the "**Cash Management System**") to collect, transfer, manage and disburse funds that the Debtor has borrowed, generated, and/or used in its operations. The Cash Management System supports the Debtor's ability to monitor, forecast, and report on its use of and availability of cash and enables the Debtor to administer its ten (10) bank and brokerage accounts (collectively, along with any bank accounts the Debtor may subsequently open in the ordinary course of business (the "**Bank Accounts**"), which the Debtor maintains at four (4) different banking institutions (the "**Banks**"). Members of the Debtor's management team maintain daily oversight and control over the Cash Management System and administer controls for collecting, concentrating, and disbursing funds.

24. The Cash Management System is generally similar to the systems commonly used by businesses of a similar size. As discussed in greater detail below, the Cash Management System is comprised of the following primary components: (a) a primary account for collecting and disbursing cash in the ordinary course of operations (the "**General Operations Account**"); (b) secondary accounts that are used to pay operating expenses and petty cash expenses (the "**Operating Expense Accounts**"); (c) a secondary account used for the Debtor's payroll (the "**Payroll Account**"); (d) an account used for collecting and disbursing restricted cash (the "**Restricted Cash Account**"); an investment brokerage account for a charitable remainder annuity trust (the "**Investment Account**"); and (e) an escrow account to hold entrance fee funds (the "**Escrow Account**").

25. The Debtor maintains bank accounts at four separate Banks to facilitate its Cash Management System: (a) City National Bank, where the Debtor maintains seven (7) of the Bank Accounts; (b) Wells Fargo Bank, where the Debtor maintains one of the Bank Accounts; (c) U.S. Bank, where the Debtor maintains one of the Bank Accounts; and (d) Mid Atlantic Capital Corporation, where the Debtor maintains its brokerage Bank Account. The majority of the transactions the Debtor performs using its Bank Accounts are accomplished through the use of electronic funds transfers and checks.

DECLARATION OF STEVEN A. NERGER ISO "FIRST DAY MOTIONS"

17350755.3

26.     The Debtor's account at City National Bank which has the account number ending in 3070 serves as Debtor's General Operations Account.  The Debtor uses the General Operations Account for the majority of its cash transactions in the ordinary course of its operations.  The Debtor routinely deposits, withdraws and otherwise transfers money to and from the General Operations Account by various methods, including by drafts, ACH transfers and other electronic funds transfers. The Debtor's business revenue is primarily derived from the operation of two full service CCRC Facilities– the Debtor's Forest Hill facility in Pacific Grove, California and its Lake Park facility in Oakland, California.  The overwhelming majority of the Debtor's deposits are from the residents' payments of monthly fees and Medicare payments for residents' care. Over the last year, the Debtor has also occasionally received COVID-related stimulus payments from the U.S. Department of Health & Human Services.  The Debtor collects and deposits funds in the General Operations Account through personal checks, direct debits from certain residents' bank accounts, ACH transfers, and other electronic funds transfers.

27.     The Debtor uses the General Operations Account for most disbursements it makes in the ordinary course other than for payroll and expenses related to the operation of the Debtor's two CCRC Facilities.  The Debtor also uses the General Operations Account to fund most of the accounts the Debtor's Operating Expense Accounts and its Payroll Account.

28.     The Debtor uses five separate Operating Expense Accounts. Four of these accounts are zero balance accounts at City National Bank that draw funds from the General Operations Account.  The Debtor's Controller uses the two accounts at City National Bank with account numbers ending in 3410 and 3380 to pay for general operating expenses for its Forest Hill facility and its Lake Park facility respectively.

29.     The Executive Directors of the Debtor's Forest Hill facility and Lake Park facility generally use the two accounts at City National Bank with account numbers ending in 3402 and 3399 respectively (a) to pay for operating expenses that generally arise on an emergency basis or otherwise require immediate payment or (b) to pay vendors for which

17350755.3

the Debtor does not have an established relationship. Examples of these types of expenses might be a plumber who is retained to unclog a sink or a band that is hired to provide entertainment for the residents.

30. The last of the Debtor's Operating Expense Accounts is a Wells Fargo account with account number ending in 8739 that the Debtor's Controller uses for the Forest Hill facility's petty cash deposits and payments.

31. The Debtor uses the account at City National Bank with account number ending in 3259 as the Debtor's Payroll Account. The Payroll Account is a zero balance account that draws necessary funds from the General Operations Account.

32. The Debtor uses the City National Bank account ending in 3267 as its Restricted Cash Account. The Restricted Cash Account holds restricted funds – e.g. charitable donations that are earmarked to be spent for a specific purpose. The Debtor also uses the Restricted Cash Account to make related disbursements.

33. In the past, DSS had required the Debtor to hold new resident deposits in a separate escrow account. The Debtor used an account at U.S. Bank with account number ending with 1000 as the Escrow Account for this purpose. DSS subsequently lifted this restriction, so the Escrow Account no longer has a cash balance, but the Debtor has kept this account open in case DSS again requires the Debtor to deposit new resident deposits in the Escrow Account.

34. The Debtor maintains its Investment Account at Mid Atlantic Capital Corporation in account number ending 7594. The Debtor primarily uses the Investment Account to hold an investment portfolio for a charitable remainder annuity trust. The Investment Account primarily holds various equity securities, some fixed income securities, and a small cash balance.

35. Continued use of the Bank Accounts to receive revenue and process disbursements, including but not limited to, payroll and ordinary course expenses, is important to the efficient execution and achievement of the Debtor's business objectives, and ultimately, to maximizing the value of the Debtor's estate.

Case: 21-40363   Doc# 14   Filed: 03/16/21   Entered: 03/16/21 17:00:53   Page 9 of 24

17350755.3

36.     The Debtor uses a variety of preprinted business forms, including letterhead, correspondence forms, invoices, purchase orders, checks, and other business forms in the ordinary course of business (collectively, and as they may be modified from time to time, the "**Business Forms**").  The Debtor also maintains books and records using Microsoft Dynamics GP, an accounting software platform, to document its financial results and a wide array of necessary operating information (collectively, the "**Books and Records**"). To avoid a significant disruption to its business and to avoid unnecessary expense, the Debtor requests authorization to continue using all of the Business Forms and Books and Records in use immediately before the Petition Date (and as may be amended or modified in the ordinary course from time to time), including with respect to the Debtor's ability to update authorized signatories and services, as needed—without reference to the Debtor's status as a Chapter 11 debtor-in-possession—rather than requiring the Debtor to incur the expense and delay of ordering new Business Forms and creating new Books and Records.

**MOTION OF DEBTOR FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) PAY PREPETITION WAGES, SALARIES, COMPENSATION, REIMBURSABLE EXPENSES, AND OTHER OBLIGATIONS ON ACCOUNT OF COMPENSATION AND BENEFITS PROGRAMS, (B) CONTINUE COMPENSATION AND BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

37.     As of the Petition Date, the Debtor employed 223 employees, including 204 employees who are paid on an hourly basis and 19 employees who earn salaries (collectively, the "**Employees**"). Debtor's Employees that work at its Lake Park and Forest Hill facilities are typically paid biweekly in arrears, and Debtor's corporate Employees are typically paid semi-monthly in arrears.  The Employees (i) provide skilled nursing services to residents; (ii) provide food service, housekeeping, laundry, maintenance, activities, and other essential services for the residents; (iii) coordinate admissions of residents; (iv) perform essential administrative and managerial functions for the Debtor; and (v) perform other critical services and functions for the Debtor.

17350755.3

38.     The Debtor's Employees are its lifeblood.  The Debtor's residents rely on Debtor to provide a wide range of care, activities, and services.  Without the Employees, the Debtor would be unable to safely run its facilities, ensure the safety and well-being of its residents, or provide critical healthcare services to its residents. I believe that the Employees rely exclusively or primarily on the compensation and benefits they receive through the Compensation and Benefits Programs (defined below) to pay their daily living expenses and support their families.  The Employees will face significant financial consequences if the Debtor is not permitted to continue to administer the Compensation and Benefits Programs in the ordinary course of business.  Further, the Debtor's failure to honor its obligations in connection with the Compensation and Benefits Programs risks the loss of the Employees, each of whom is critical to Debtor's continued operations.

39.     The Debtor pays various wages, salaries, compensation, reimbursable expenses, and other administrative fees, obligations, and premiums in connection with its various compensation and benefits programs.  The Debtor estimates that, as of the Petition Date, it owes approximately $652,000 on account of Compensation and Benefits Programs, approximately $282,000 of which will become due and payable during the interim period (depending on the timing of the "second day hearing".)

40.     In the ordinary course of business, the Debtor pays wages, salaries, and other compensation, as well as compensation-related fees, taxes, withholdings, and other obligations on account of its Employees, including:  (i) Employee Obligations and (ii) Employer Payroll Tax Obligations (as each is defined below, and collectively, the "**Compensation Obligations**").

41.     The Debtor pays Employees' wages, salaries, and other compensation (collectively, the "**Employee Obligations**") either on a biweekly basis or, for corporate Employees, on a semi-monthly basis.  On average, Debtor pays approximately $908,958.20 each month on account of Employee Obligations.  Because Employees are paid in arrears, the Debtor will owe most of the Employees accrued but unpaid Employee Obligations as of the Petition Date.  By this Motion, the Debtor seeks authority to continue

paying Employee Obligations in the ordinary course and to pay any prepetition amounts, subject to the $13,650 priority cap imposed by section 507(a)(4) of the Bankruptcy Code. As of the Petition Date, the aggregate amount of earned, but unpaid, prepetition Employee Obligations total approximately $200,000, all of which will become due and payable within the first thirty (30) days of the Chapter 11 Case (the "**Interim Period**").

42.     The Debtor is required by law to withhold income taxes, as well as Social Security and Medicare taxes (collectively, the "**Withholding Taxes**") and remit them to the appropriate taxing authorities. The Debtor is also required to make payments from its own funds on account of Social Security and Medicare taxes and to pay for, among other things, state and federal unemployment insurance (collectively, the "**Employer Payroll Taxes**" and, together with the Withholding Taxes, the "**Payroll Tax Obligations**"). As a part of the Coronavirus Aid, Relief, and Economic Security (CARES) Act, employers like the Debtor were given the opportunity to defer payment of a portion of their Employer Payroll Tax Obligations for payroll paid between March 12, 2020 and December 31, 2020. (*See* CARES Act, Pub. L. No. 116-136, § 2302, 134 Stat. 281, 351.) Debtor elected to defer payment of a portion of its Employer Payroll Taxes as permitted by the CARES Act. The remaining balance of the deferred Employer Payroll Tax Obligations is approximately $366,072 and must be repaid on or before December 31, 2021.

43.     The Debtor also may be required by law to withhold from certain Employee's wages amounts for various garnishments, such as tax levies, child support or other court-ordered garnishments (collectively, the "**Garnishments**" and together with the Payroll Tax Obligations the "**Withholding Obligations**"). As of the Petition Date, the aggregate amount of accrued, but unpaid, prepetition Withholding Obligations total approximately $450,000, approximately $80,000 of which will become due and payable during the interim period.

44.     The Debtor, in the ordinary course of its business, reimburses certain corporate Employees for expenses for mobile phones they use in the course of their work (the "**Reimbursement Obligations**"). The Debtor pays the Reimbursement Obligations

DECLARATION OF STEVEN A. NERGER ISO "FIRST DAY MOTIONS"

17350755.3

as a part of the Employees' semi-monthly paychecks. As of the Petition Date, I do not believe that the Debtor owes the Employees any material amount for the Reimbursement Obligations, but the Debtor seeks authorization to make payments for prepetition Reimbursement Obligations to the extent any exist.

45. In the ordinary course of business, the Debtor provides various employee benefit programs to eligible Employees. These benefit programs include: (i) the Medical Benefits Program; (ii) the 403(b) Plan; (iii) Paid Leave; and (iv) the Workers' Compensation and Disability Programs (as each is defined below and together the "**Employee Benefits Programs**"). The Debtor estimates that, as of the Petition Date, the aggregate amount of accrued, but unpaid, monetary obligations related to Employee Benefit Programs total approximately $887,429.83, of which approximately $2,000 will become due and payable during the interim period.

46. In the ordinary course of business, the Debtor offers the Employees and their dependents health care coverage from Kaiser Permanente ("**Kaiser**") and United Healthcare Services ("**UHC**"), dental care coverage from Delta Dental of California ("**Delta**"), and vision coverage from VSP Vision Care ("**VSP**"). The Debtor makes the payments for premiums and other charges ("**Health Care Plan Fees**") directly to Kaiser, UHC, Delta, and VSP in advance each month.

47. I believe the Debtor is current on the Health Care Plan Fees. To the extent it is not, however, the Debtor seeks authority to pay any Health Care Plan Fees that accrued and remain unpaid as of the Petition Date. The Debtor also seeks authority to continue to pay, in its discretion and in the ordinary course of their business, the Health Care Plan Fees incurred postpetition.

48. The Debtor offers a qualified 403(b) plan (the "**403(b) Plan**") to certain Employees, which includes an employer match of a portion of these Employees' contributions. The aggregate amount typically contributed by the Debtor to the 403(b) Plan under the employer match is approximately $5,000 per month (collectively, the "**403(b) Matching Contributions**"). The Debtor estimates that approximately $2,000 in prepetition

Case: 21-40363   Doc# 14   Filed: 03/16/21   Entered: 03/16/21 17:00:53   Page 13 of 24
DECLARATION OF STEVEN A. NERGER ISO "FIRST DAY MOTIONS"
17350755.3

403(b) Matching Contributions is accrued and unpaid as of the Petition Date, all of which will come due during the interim period.

49.     In the ordinary course of business, the Debtor provides between 15 and 25 days of paid time off ("**Paid Time Off**") to the Employees who have accrued at least one year of service based on their seniority.  In addition, the Debtor provides certain other forms of paid leave (together with Paid Time Off, the "**Paid Leave**") to Employees, many of which are required by U.S., state, and local law, which accrues based on seniority.  Employees can carry over unused Paid Time Off from year to year, but the accrual of Paid Time Off is subject to a maximum cap of between 180 hours and 300 hours depending on the Employees' seniority, position, and other factors.  Paid Time Off may not be "cashed out" by an Employee unless their employment with the Debtor is terminated.

50.     As of the Petition Date, the Debtor estimates that the Employees have accrued approximately $885,429.83 in the aggregate for unused Paid Time Off that accrued prepetition.  The Debtor seeks authority to continue the Paid Leave policies in the ordinary course of business.

51.     The Debtor maintains workers' compensation insurance (the "**Workers' Compensation Policies**") for Employees at the levels required by California law for claims arising from or related to the Employees' employment with the Debtor.  Because workers compensation claims are covered by the Debtor's insurance, I do not believe that the Debtor owes any of the Employees any amount in connection with the Workers' Compensation Policies.

52.     The Debtor offers certain managerial and corporate Employees short and long term disability insurance (the "Disability Program") through UNUM Life Insurance Company of America.  I do not believe that the Debtor owes any prepetition amount in connection with the Disability Program.

Case: 21-40363   Doc# 14   Filed: 03/16/21   Entered: 03/16/21 17:00:53   Page 14 of
24
17350755.3

DECLARATION OF STEVEN A. NERGER ISO "FIRST DAY MOTIONS"

**MOTION FOR ENTRY OF AN ORDER (I) PROHIBITING UTILITIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE; (II) APPROVING DEBTOR'S PROPOSED FORM OF ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES; AND (III) ESTABLISHING PROCEDURES FOR PROVIDING ADEQUATE ASSURANCE AND RESOLVING OBJECTIONS OF UTILITY PROVIDERS**

53.     In the ordinary course of its business, the Debtor incurs expenses for electricity, natural gas, telephone, internet, waste management, and other utility services (collectively, the "**Utility Services**").

54.     The Debtor historically has had a good payment history with the Utility Providers. To the best of the Debtor's knowledge, there are no defaults or material arrearages for the Debtor's undisputed invoices for prepetition Utility Services other than payment interruptions that may be caused by the commencement of the Chapter 11 Case. Based on the monthly average for the twelve (12) months prior to the Petition Date, the Debtor estimates that its cost of Utility Services for the next thirty (30) days will be approximately $121,269.29

55.     Uninterrupted Utility Services are essential to the Debtor's ongoing operations and, therefore, the success of the Debtor's reorganization. The Debtor coordinates its operations through its headquarters in Oakland, California and other facilities located in California, including without limitation, the Debtor's full service retirement communities located in Oakland, California, and Pacific Grove, California. Any interruption of Utility Services provided at these locations would disrupt the Debtor's ability to communicate with, and provide the necessary support and services to, its employees, vendors, and, most importantly, customers. Should any Utility Provider alter, refuse, or discontinue service, even briefly, the Debtor's business operations could be severely disrupted, which, in turn, could lead to subsequent service disruptions for the Debtor's customers. Any disruptions, therefore, would negatively impact the Debtor's business operations, customers, and all parties in interest. In addition, disruption of the Debtor's Utility Services could cause detrimental impact on the health, wellbeing, and lives of the

17350755.3

residents in Debtor's retirement communities.

**MOTION OF THE DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTOR TO (I) CONTINUE INSURANCE COVERAGE ENTERED INTO PREPETITION AND SATISFY PREPETITION OBLIGATIONS RELATED THERETO; AND (II) RENEW, AMEND, SUPPLEMENT, EXTEND, OR PURCHASE <u>INSURANCE POLICIES</u>**

56.     In the ordinary course of business, the Debtor maintains approximately ten (10) insurance policies that are administered by various third-party insurance carriers (collectively, the "**Insurance Carriers**"). These policies provide coverage for, among other things, general and professional liability, umbrella liability, commercial auto, commercial property, crime and fiduciary liability, director's and officer's liability/employment practices liability, workers compensation, excess director's and officer's liability, difference in condition, and cyber liability (collectively, the "**Insurance Policies**"). A schedule of the Insurance Policies is attached hereto as **Exhibit 2**.

57.     The aggregate annual premium for the Insurance Policies is  approximately $636,298 not including applicable taxes and surcharges, deductibles, and broker and consulting fees and commissions.

58.     Pursuant to the Insurance Policies, the Debtor may be required to pay various deductibles or retention amounts (the "**Insurance Deductibles**"), depending upon the type of claim and insurance policy involved. Under certain Insurance Policies, the Insurance Carriers and third-party administrators may pay claimants and then invoice the Debtor for reimbursement for claims paid within any Insurance Deductible. In such situations, the Insurance Carriers may have prepetition claims against the Debtor. As of the Petition Date, the Debtor does not believe there are any material prepetition obligations owed to Insurance Carriers relating to Insurance Deductibles, but, out of an abundance of caution, the Debtor seeks authority to satisfy any such prepetition obligations, and to continue honoring all obligations thereunder on a postpetition basis in the ordinary course of business.

DECLARATION OF STEVEN A. NERGER ISO "FIRST DAY MOTIONS"

17350755.3

59. Continuation of the Debtor's Insurance Policies, and entry into new insurance policies, is essential to the preservation of the value of the Debtor's business and operations. Moreover, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtor's commercial activities, including the Office of the United States Trustee's (the "**U.S. Trustee**") requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case. Accordingly, to ensure uninterrupted coverage, the Debtor requests authority to maintain its existing Insurance Policies, pay any prepetition Insurance Obligations related thereto, and enter into new Insurance Policies in the ordinary course of business.

60. In the ordinary course of business, the Debtor utilizes USI Insurance Services, LLC as its insurance broker (the "**Insurance Broker**") to obtain its Insurance Policies. The Insurance Broker primarily assists the Debtor with the procurement and negotiation of the Insurance Policies, enabling the Debtor to obtain the Insurance Policies on advantageous terms and at competitive rates. The Insurance Broker is compensated for its services through either a commission from the Insurance Carriers (the "Brokerage Fees"). To the best of the Debtor's knowledge, it does not owe any prepetition Brokerage Fees. To the extent the Debtor has to pay the Brokerage Fees in the future, the Debtor seeks the Court's authority to do so since the employment of the Insurance Broker allows the Debtor to obtain and manage its program of Insurance Policies in a reasonable and prudent manner and to realize considerable savings in the procurement of the Insurance Policies by having access to market comparables provided by the Insurance Brokers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED: March 16, 2021

By: /s/ Steven A. Nerger
Steven A. Nerger
Chief Restructuring Officer

Case: 21-40363   Doc# 14   Filed: 03/16/21   Entered: 03/16/21 17:00:53   Page 17 of
24

17350755.3

# EXHIBIT 1

# California-Nevada Methodist Homes
## 13-Week Cash Flow
### Cash Flow Summary

| Description | March 19-Mar Projected | March 26-Mar Projected | March 2-Apr Projected | April 9-Apr Projected | April 16-Apr Projected | April 23-Apr Projected | April 30-Apr Projected | May 7-May Projected | May 14-May Projected | May 21-May Projected | May 28-May Projected | June 4-Jun Projected | June 11-Jun Projected | TOTAL Projected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | | | | |
| **Net Sales** | | | | | | | | | | | | | | |
| Monthly Care Fees | 210 | 210 | 210 | 263 | 263 | 263 | 263 | 262 | 262 | 262 | 262 | 208 | 208 | 3,145 |
| Private Fees | 52 | 52 | 52 | 65 | 65 | 65 | 65 | 66 | 66 | 66 | 66 | 52 | 52 | 782 |
| Medicare | 38 | 38 | 38 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 38 | 38 | 581 |
| Other Income | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 12 |
| Misc Revenue | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 28 |
| Amortization of Entrance Fees | 37 | 37 | 37 | 46 | 46 | 46 | 46 | 48 | 48 | 48 | 48 | 38 | 38 | 563 |
| Admin Revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Sales** | 341 | 341 | 341 | 425 | 425 | 425 | 425 | 427 | 427 | 427 | 427 | 339 | 339 | 5,111 |
| **RECEIPTS** | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | |
| A/R Collections | 302 | 302 | 302 | 379 | 379 | 379 | 379 | 379 | 379 | 379 | 379 | 301 | 301 | 4,543 |
| Other Cash Collections | | | | | | | | | | | | | | |
| **Cash Receipts** | 302 | 302 | 302 | 379 | 379 | 379 | 379 | 379 | 379 | 379 | 379 | 301 | 301 | 4,543 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | |
| **Payroll and Benefits** | | | | | | | | | | | | | | |
| Payroll | 143 | 143 | 143 | 179 | 179 | 179 | 179 | 180 | 180 | 180 | 180 | 144 | 144 | 2,153 |
| Payroll Taxes | 12 | 12 | 12 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 12 | 12 | 186 |
| Benefits | 37 | 37 | 37 | 48 | 48 | 48 | 48 | 47 | 47 | 47 | 47 | 39 | 39 | 569 |
| All Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Payroll** | 192 | 192 | 192 | 243 | 243 | 243 | 243 | 243 | 243 | 243 | 243 | 195 | 195 | 2,907 |
| *Payroll%* | *56.4%* | *56.4%* | *56.4%* | *57.1%* | *57.1%* | *57.1%* | *57.1%* | *56.8%* | *56.8%* | *56.8%* | *56.8%* | *57.4%* | *57.4%* | *56.9%* |
| **Operational Disbursements** | | | | | | | | | | | | | | |
| Food Service | 36 | 36 | 36 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 35 | 35 | 530 |
| Housekeeping | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 3 | 3 | 42 |
| Laundry | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Plant and Operations | 14 | 14 | 14 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 14 | 14 | 205 |
| Utilities | 23 | 23 | 23 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 23 | 23 | 350 |
| Nursing | 8 | 8 | 8 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 113 |
| Assisted Living | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 8 |
| Administration | 41 | 41 | 41 | 52 | 52 | 52 | 52 | 50 | 50 | 50 | 50 | 40 | 40 | 612 |
| Marketing | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 36 |
| Medical Receptionist | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Activities | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 2 | 2 | 33 |
| Medical Care Ancillary | 11 | 11 | 11 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 11 | 11 | 171 |
| Inservice Education | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Home Office Charges | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Social Services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Misc. | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Disbursements** | 140 | 140 | 140 | 176 | 176 | 176 | 176 | 175 | 175 | 175 | 175 | 140 | 140 | 2,105 |

3/15/20218:19 AM

CNMH Financial Package v2

Case: 21-40363   Doc# 14   Filed: 03/16/21   Entered: 03/16/21 17:00:53   Page 19 of 24

13 Week Cash Flow

| Description | March | | | April | | | | May | | | | June | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 19-Mar | 26-Mar | 2-Apr | 9-Apr | 16-Apr | 23-Apr | 30-Apr | 7-May | 14-May | 21-May | 28-May | 4-Jun | 11-Jun | |
| | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* |
| | | | | | | | | | | | | | | |
| **Operating Disbursements** | 332 | 332 | 332 | 419 | 419 | 419 | 419 | 417 | 417 | 417 | 417 | 335 | 335 | 5,013 |
| **Other (Income)/Expenses** | | | | | | | | | | | | | | |
| Silverman Consulting | 6 | 6 | 6 | 10 | 10 | 10 | 10 | 5 | 5 | 5 | 5 | 4 | 4 | 86 |
| All Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Debt Service** | | | | | | | | | | | | | | - |
| Interest Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Bond Principal Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Expenses/ (Income) | 6 | 6 | 6 | 10 | 10 | 10 | 10 | 5 | 5 | 5 | 5 | 4 | 4 | 86 |
| **Total Disbursements** | 338 | 338 | 338 | 429 | 429 | 429 | 429 | 422 | 422 | 422 | 422 | 339 | 339 | 5,099 |
| **Net Cash Flow** | (36) | (36) | (36) | (49) | (49) | (49) | (49) | (43) | (43) | (43) | (43) | (38) | (38) | (555) |
| | | | | | | | | | | | | | | |
| **Sources & Uses Summary** | | | | | | | | | | | | | | Total |
| Implied EBITDA | (29) | (29) | (29) | (39) | (39) | (39) | (39) | (38) | (38) | (38) | (38) | (34) | (34) | (465) |
| Accounts Receivable | (1) | (1) | (1) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | 0 | 0 | (4) |
| Accounts Payable | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Accruals | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Working Capital** | (1) | (1) | (1) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | 0 | 0 | (4) |
| Debt Service and Other | | | | | | | | | | | | | | - |
| Interest Expense | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Silverman Consulting | (6) | (6) | (6) | (10) | (10) | (10) | (10) | (5) | (5) | (5) | (5) | (4) | (4) | (86) |
| **Other Disbursements** | (6) | (6) | (6) | (10) | (10) | (10) | (10) | (5) | (5) | (5) | (5) | (4) | (4) | (86) |
| **(Increase)/Decrease in Cash** | 36 | 36 | 36 | 49 | 49 | 49 | 49 | 43 | 43 | 43 | 43 | 38 | 38 | 555 |

# California-Nevada Methodist Homes
## 13-Week Cash Flow
## Cash Rollforward

| Description | March | | | | April | | | | May | | | | June | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12-Mar | 19-Mar | 26-Mar | 2-Apr | 9-Apr | 16-Apr | 23-Apr | 30-Apr | 7-May | 14-May | 21-May | 28-May | 4-Jun | 11-Jun | Projected |
| | Actual | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | |
| **CASH** | | | | | | | | | | | | | | | |
| **Cash** | | | | | | | | | | | | | | | |
| Balance (Beginning) | - | 1,690 | 1,653 | 1,617 | 1,581 | 1,531 | 1,482 | 1,432 | 1,383 | 1,340 | 1,297 | 1,254 | 1,211 | 1,173 | 1,690 |
| Receipts | - | 302 | 302 | 302 | 379 | 379 | 379 | 379 | 379 | 379 | 379 | 379 | 301 | 301 | 4,543 |
| Disbursements | - | (338) | (338) | (338) | (429) | (429) | (429) | (429) | (422) | (422) | (422) | (422) | (339) | (339) | (5,099) |
| **Cash** | 1,690 | 1,653 | 1,617 | 1,581 | 1,531 | 1,482 | 1,432 | 1,383 | 1,340 | 1,297 | 1,254 | 1,211 | 1,173 | 1,135 | 1,135 |
| *Increase/(Decrease)* | - | (36) | (36) | (36) | (49) | (49) | (49) | (49) | (43) | (43) | (43) | (43) | (38) | (38) | (555) |

Case: 21-40363    Doc# 14    Filed: 03/16/21    Entered: 03/16/21 17:00:53    Page 21 of 24
CNMH Financial Package v2

# EXHIBIT 2

| Policy Term | Policy Type | Carrier | Policy # | Coverage/Limits | | Deductible, if any | Premium Including Taxes/Fees |
|---|---|---|---|---|---|---|---|
| 4/1/2020-2021 | Property | Federal Insurance Co. | 35819694 | Building Value | $85,015,095 | Bldg/PP $10,000 | $ 88,322 |
| | | | | Personal Property Value | $3,450,000 | | |
| | | | | Business Income/Extra Expense | $11,457,059 | 24 Hr waiting period | |
| | | | | Emergency Patient Evacuation | $100,000 | | |
| | | | | Total Insured Values | $99,922,154 | | |
| 4/1/2020-2021 | Difference in Conditions (DIC) | Evanston 10275 West Higgins Road, Ste 750 Rosemont, IL 60018 | MKLV14PP013866 | Earthquake Including Sprinkler Leakage | $7.5M Ea./$7.5M Agg. | 10%/Min. $25k | $ 64,531 |
| | | | | Flood | $7.5M Ea./$7.5M Agg. | $50,000 All other causes of loss: $25k | |
| 4/1/2020-2021 | General/Professional Liability | Columbia Casualty Co. 151 N. Franklin St. Chicago, IL 60606 | PLO6046018376 | Policy Aggregate | $7,000,000 | EBL $1,000 | $ 171,208 |
| | | | | **Professional Liability:** | | | |
| | | | | Each Claim | $1,000,000 | | |
| | | | | Aggregate | $3,000,000 | | |
| | | | | **General Liability:** | | | |
| | | | | Each Occurrence | $1,000,000 | | |
| | | | | Personal and Advertising Injury | $1,000,000 | | |
| | | | | Damage to Rented Premises | $100,000 | | |
| | | | | Medical Expense | $5,000 | | |
| | | | | General Aggregate | $3,000,000 | | |
| | | | | **Employee Benefits Liability (EBL):** | | | |
| | | | | Each Employee | $1,000,000 | | |
| | | | | Aggregate | $1,000,000 | | |
| 4/1/2020-2021 | Commercial Automobile Alternate address: P.O. Box 94733 Chicago, IL 60690-4733 | American Casualty Co. of Reading, PA 151 N. Franklin St Chicago, IL 60606 | BUA6046018393 | Combined Single Limit Liability | $2,000,000 | Comp/Coll $1,000 | $ 16,413 |
| | | | | Uninsured Motorist | $1,000,000 | VIN 61108: Comp/Coll $2,000 | |
| | | | | Medical Payments | $5,000 | | |
| | | | | Vehicle Count | 4 | | |
| 4/1/2020-2021 | Workers' Compensation (WC)/ Employer's Liability (EL) | Cypress Insurance Co. Berkshire Hathaway Homestate Co. PO Box 881236 San Francisco, CA 94188 | CAWC139814 | Workers' Compensation | Statutory | | $ 175,577 |
| | | | | Bodily Injury by Accident-Each Accident | $1,000,000 | | |
| | | | | Bodily Injury by Disease-Policy Limit | $1,000,000 | | |
| | | | | Bodily Injury by Disease-Each Employee | $1,000,000 | | |
| 4/1/2020-2021 | Umbrella | Columbia Casualty Co. 151 N. Franklin St. Chicago, IL 60606 | UMB6046018409 | Each Claim | $3,000,000 | | $ 70,034 |
| | | | | Aggregate | $3,000,000 | | |
| | | | | **Underlying Policies:** | | | |
| | | | | General Liability | | | |
| | | | | Auto Liability | | | |
| | | | | Employer's Liability | | | |
| | | | | Professional Liability | | | |
| | | | | Employee Benefits Liability | | | |

Case: 21-40363    Doc# 14    Filed: 03/16/21    Entered: 03/16/21 17:00:53    Page 23 of 24

| Policy Term | Policy Type | Carrier | Policy # | Coverage/Limits | | Deductible, if any | Premium Including Taxes/Fees |
|---|---|---|---|---|---|---|---|
| 4/1/2020-2021 | Crime/Fiduciary Liability | Travelers Casualty and Surety Co. of America One Tower Square Hartford, CT 06183 | 105590982 | **Fidelity:** | | | $ 2,575 |
| | | | | Limit for all Claims | $500,000 | $0 | |
| | | | | Settlement Program | $100,000 | $0 | |
| | | | | HIPAA | $100,000 | $0 | |
| | | | | Prior and Pending Date | 06/26/2001 | | |
| | | | | Continuity Date | 06/26/2001 | | |
| | | | | **Crime:** | | | |
| | | | | Employee Theft | $500,000 | $10,000 | |
| | | | | ERISA Fidelity | $500,000 | $0 | |
| | | | | On Premises | $3,000 | $500 | |
| | | | | In Transit | $3,000 | $500 | |
| | | | | Computer Fraud | $500,000 | $10,000 | |
| | | | | Computer-Data Restoration | $100,000 | $10,000 | |
| | | | | Funds Transfer Fraud | $500,000 | $10,000 | |
| | | | | Claim Expense | $5,000 | $0 | |
| 4/1/2020-2021 | Director's and Officer's (D&O) Liability/ Employment Practices Liability (EPL) | Arch Insurance Co. One Liberty Plaza, 53rd Floor New York, NY 10006 | NFP013300102 | Policy Aggregate | $5,000,000 | | $ 27,164 |
| | | | | Defense Outside Aggregate | $1,000,000 | | |
| | | | | **D&O:** | | | |
| | | | | Nonprofit Organization Liability | $5,000,000 | $0 | |
| | | | | Sublimits: | | | |
| | | | | Insured Person Liability | $5,000,000 | $0 | |
| | | | | Organization Reimbursement | $5,000,000 | $20,000 | |
| | | | | Organization Liability | $5,000,000 | $20,000 | |
| | | | | Derivative Demands | $250,000 | $0 | |
| | | | | Pending & Prior Litigation Date | 07/01/1994 | | |
| | | | | **EPL:** | | | |
| | | | | Sublimits: | | | |
| | | | | EPL | $5,000,000 | $35,000 | |
| | | | | Third Party Liability | $5,000,000 | $35,000 | |
| | | | | Pending & Prior Litigation Date | 07/01/1994 | | |
| 4/1/2020-2021 | Excess D&O | RSUI Indemnity Co. 945 E. Paces Ferry Rd. Ste 1800 Atlanta, GA 30326 | NHS686399 | Excess D&O Aggregate | $ 5,000,000 | | $ 17,634 |
| 5/19/2020-4/1/2021 | Cyber Liability | Lloyds of London Tokio Marine syndicate Cyber & Professional Lines Group 16501 Ventura Blvd Ste 200 Encino, CA 91436 | 1135831 | Max Policy Aggregate | $1,000,000 | $5,000 | $ 2,840 |
| | | | | Additional Defense Costs | $1,000,000 | $5,000 Aggregate $15,000 | |
| | | | | Retroactive Date | Full Prior Acts | | |
| | | | | | | | $ 636,298 |

Case: 21-40363   Doc# 14   Filed: 03/16/21   Entered: 03/16/21 17:00:53   Page 24 of 24