**Entered on Docket**
**April 11, 2023**
**EDWARD J. EMMONS, CLERK**
**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**



The following constitutes the order of the Court.
Signed: April 11, 2023

_____
**Charles Novack**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

In re:

CALIFORNIA-NEVADA  METHODIST
HOMES,

　　　　　　　Debtor.

Case No.  21-40363 CN
Chapter 11

**MEMORANDUM DECISION RE:
WITHDRAWAL LIABILITY
PRIORITY AND ORDER SETTING
A MAY 12, 2023 STATUS
CONFERENCE**

On March 24, 2023, the court conducted a hearing on creditor SEIU National Industry Pension Fund's (the "Pension Fund") request for payment of an administrative expense in this Chapter 11 case (the "Application").[1]  Appearances were stated on the record.  The basis of the Pension Fund's request is seemingly straightforward:  California-Nevada Methodist Homes (the "Debtor" or "Cal-Nevada") has sold its two continuing care retirement facilities and terminated almost all its employees.  Several of the Debtor's former employees are SEIU union members who participate in a defined benefit retirement plan administered by the Pension Fund.  Under ERISA and its applicable amendments, the Debtor's actions resulted in a pension fund withdrawal liability.  The Pension Fund has

---

[1] The Pension Fund also moved for an order authorizing it to file a proof of claim after the claims bar date.  For the reasons stated on the record, the court denied the motion on the ground that its failure to timely file a proof of claim was not a product of "excusable neglect."

calculated this liability and contends that it can apportion it into pre-petition and post-petition tranches, the latter of which (it argues) constitutes an administrative expense.

The Debtor strongly disagrees. It contends that this court must apply an exacting standard for recognizing administrative expenses and that the factors used by the Pension Fund to calculate the withdrawal liability are far afield from any benefit generated by the union employees' post-petition work. For the reasons stated below, the court sides with the Pension Fund.

California-Nevada Methodist Homes commenced this Chapter 11 case on March 16, 2021. On the petition date, Cal-Nevada operated two continuing care retirement communities, one of which was in Oakland, California (the "Lake Park" facility). Several of the former Lake Park employees are members of SEIU Local 2015 Union (the "Employees") who participate in a defined benefit retirement plan administered by the Pension Fund. A defined benefit plan "is a pension plan under which an employee receives a set monthly amount upon retirement for his or her life, with the benefit amount typically based upon the participant's wages and length of service." *In re Schering Plough Corp. ERISA Litg.*, 589 F.3d 585, 595 n. 8 (3d Cir. 2009); *see also* Montgomery Decl. Ex. 4, at i, ECF No. 656. As succinctly explained by the Third Circuit in *In re Marcal Paper Mills, Inc.*,

> In other words, the employer has promised the employee a certain pension benefit. The benefit level is set by the plan trustee based on the "expected resources" of the plan. "The resources of a plan available to pay those benefits consist of assets held by the plan." Those assets include, "[f]uture contributions expected by the plan and income expected to be earned on plan investments." Accordingly, in a defined benefit plan, the employer's continuing contributions to the plan are designed to provide a subsequent benefit to the employee upon retirement.

650 F.3d 311, 315 (3d Cir. 2011) (internal citations omitted).

Cal-Nevada made monthly pre and post-petition contributions to the Pension Fund on the Employees' behalf, which payments ended when it terminated the Employees on

Case: 21-40363   Doc# 700   Filed: 04/11/23   Entered: 04/11/23 15:55:28   Page 2 of 9

December 5, 2022 and closed the sale of its facilities on December 6, 2022. These two events resulted in the Debtor's withdrawal from the Pension Fund and triggered its withdrawal liability under the Employee Retirement Income Security Act ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA").[2] The Pension Fund calculated Cal-Nevada's withdrawal liability to be $3,419,533 and asserts that $296,984 of that amount is attributable to the 634 days between the petition date and the December 6, 2022 sale closing date.

Congress recognized the need to impose withdrawal liability on employers such as Cal-Nevada when it passed the MPPAA in 1980. This statutorily imposed liability is "designed to prevent employers from withdrawing from a multiemployer pension fund without paying their share of unfunded, vested benefit liability, thereby threatening the solvency of such plans." *Mfrs. Indus. Relations Ass'n v. E. Akron Casting Co.*, 58 F.3d 204, 205 (6th Cir. 1995). "[E]ven if an employer has made all of its contributions to date, 'because benefit promises may be funded over many years after they are made, the withdrawing employer may not have made sufficient contributions to the plan to fund a fair share of the cost of those benefit promises.'" *In re Marcal Paper Mills, Inc.*, 650 F.3d at 315-16 (citation omitted). By requiring employers to pay their fair share of unfunded future benefit obligations, Congress limited their incentive to withdraw from financially strapped plans (and by so doing, ensuring the viability of the Pension Benefit Guaranty Corporation). *See Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 607–08 (1993).

The withdrawal liability calculation is a complex exercise. *See* 29 U.S.C. §§ 1381(b)(1), *et. seq*. The liability represents an employer's "proportionate share of the

---

[2] *See* 29 U.S.C. § 1381(a). Neither the Pension Fund nor the Debtor submitted to this court the underlying documents (which presumably are part of or associated with the parties' collective bargaining agreement) that a) created the Debtor's obligation to make monthly contributions and b) established its responsibility for any potential withdrawal liability. The Debtor, however, does not contest that such liability exists and it, in fact, sought and obtained a court order for the express purpose of setting a claims bar date for its potential withdrawal liability. The parties further agree that Cal-Nevada made its periodic contributions to the Pension Fund during this bankruptcy case.

- 3 -

[pension] plan's 'unfunded vested benefits,' calculated as the difference between the present value of the vested benefits and the current value of the plan's assets." *GCIU-Employer Ret. Fund v. MNG Enters.*, 51 F.4th 1092, 1095 (9th Cir. 2022) (quoting *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 217 (1986)). While the Pension Fund has not (yet) fully disclosed how it calculated the Debtor's withdrawal liability, caselaw suggests that they are several available methodologies which include factors (for example, a pension fund's investment rate of return and the ongoing contributions of the other employers participating in the fund) that are unrelated to a covered employee's work. *See, e.g.*, 29 U.S.C. § 1391; *In re Marcal Paper Mills, Inc.*, 650 F.3d 311 (3d Cir. 2011); *UMW 1974 Plan & Trust v. Lexington Coal Co., LLC (In re HNRC Dissolution Co.)*, 396 B.R. 461 (6th Cir. B.A.P. 2008).

> To summarize, withdrawal liability is calculated by, first, determining the plan-wide shortfall between the plan assets and the vested benefits the plan owes to employees. Second, once the overall size of the shortfall has been determined, the withdrawing employee's share of the shortfall is determined by calculating, in essence, the proportionate share owed to the withdrawing employer's covered employees based on the employer's contribution share over the prior five years.

*In re Marcal Paper Mills, Inc*, *supra* at 316.[3]

Allowed administrative expenses have priority over general unsecured creditor claims. *See* Bankruptcy Code § 507(a)(2). Bankruptcy Code § 503(b)(1)(A) governs the allowance of administrative expenses and provides in pertinent part that "allowed, administrative expenses . . . [include] the actual, necessary costs and expenses of preserving the estate, including – (i) wages, salaries, and commissions for services rendered after the commencement of the case." The Pension Fund bears the burden of proof and must demonstrate that the post-petition withdrawal liability tranche "(1) arose from a transaction

---

[3] The exhibits to the declaration of Yolanda Montgomery indicate that the Pension Fund also used a five year look back period to determine the Debtor's withdrawal liability. This period includes more pre-petition time than post-petition work.

with the debtor-in-possession as opposed to the preceding entity (or alternatively, that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate." *Abercrombie v. Hayden Corp. (In re Abercrombie)*, 139 F.3d 755, 757 (9th Cir. 1998) (quoting *In re DAK Indus.*, 66 F.3d 1091, 1094 (9th Cir. 1995)).

The Pension Fund easily satisfies the first element because the Employees worked for the Chapter 11 debtor-in-possession. In consideration for their post-petition work, Cal-Nevada paid wages and provided ongoing benefits including monthly contributions to their defined benefit plan.[4] Cal-Nevada's post-petition payment of their wages and benefits is an acknowledgement of its responsibility to ensure that the Employees receive their defined benefits for the work that they performed.

The heart of the issue before this court is in the second element: assuming that the Pension Fund correctly calculated the withdrawal liability and the amount attributable to the Employees' post-petition employment, did the Cal-Nevada bankruptcy estate directly and substantially benefit from the debt incurred? Relying primarily on *UMW 1974 Plan & Trust v. Lexington Coal Co., LLC (In re HNRC Dissolution Co.)*, 396 B.R. 461 (6th Cir. B.A.P. 2008), Cal-Nevada maintains it did not. Cal-Nevada argues that the withdrawal liability calculation is completely untethered from the Employees' post-petition work because it relies on factors — such as actuarial assumptions (including retirement age and mortality rates), present value analyses, Pension Fund investment strategies and investment results, and the rate of ongoing contributions from the other employers participating in the Pension Fund — that are unrelated to the benefit it received from the Employees' post-

---

[4] Debtor argues that the Pension Fund's withdrawal liability calculation is based only on services performed by the Employees through 2020 and thus cannot be attributable to the post-petition period. This argument is inapposite because it addresses *how* the withdrawal liability was calculated and not *whether* any portion of it is entitled to administrative priority. Further, as explained by the Pension Fund, the MPPAA (and not the Bankruptcy Code) determines how it calculates withdrawal liability, and while the Pension Fund's calculation considers pre-petition data, the post-petition tranche only relates to post-petition work. *See also In re Pacific Far East Line, Inc.*, 713 F.2d 476, 479 (9th Cir. 1983) (distinguishing between when pre-filing hours are consideration for payments to a pension fund plan and when these hours are merely units of measure for post-filing payments).

petition work. [5]

The Pension Fund, in turn, contends that this court should adhere to the Third Circuit's reasoning in *In re Marcal Paper Mills, Inc.*, 650 F.3d 311 (3d Cir. 2011). It argues that the post-petition tranche is an expense that Cal-Nevada agreed to pay in exchange for the Employees' post-petition work. Stated more plainly, the Pension Fund contends that this portion of the Debtor's withdrawal liability is part of the bargained-for cost of employing SEIU union members during a Chapter 11 case.

The court is persuaded by the Third Circuit's analysis. As the Third Circuit explained, "[a]n employer's withdrawal liability payment . . . is the means by which the employer funds benefits that [its] employees have 'earned' by their past service and that [it] would normally finance through continuing contributions to [its] employees' pension plan." *Id.* at 318 (quoting *Trustees of the Amalgamated Ins. Fund v. McFarlin's Inc.*, 789 F.2d 98, 104 (2d Cir. 1986)). The Third Circuit firmly stated that

> [I]t is clear that the covered employees were required to perform work post-petition in order to keep DIP Marcal in operation, unquestionably conferring a benefit to the estate. Pursuant to the continued-CBA and pension plan, Marcal promised to provide pension benefits in exchange for that post-petition work. The portion of the withdrawal liability which corresponds to that post-petition work is owed by Marcal LLC in fulfillment of the promise it assumed as part of its purchase of Marcal's assets to provide post-petition work. Therefore, the requirements of . . . sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code are satisfied. We agree with the District Court and hold that the portion of the withdrawal liability attributable to the post-petition period is entitled to administrative priority.

*Id.* at 317.

The Third Circuit made short shrift of Cal-Nevada and the 6th Circuit BAP's concern regarding the factors used to calculate the liability. The Third Circuit noted that Marcal

---

[5] The court, the Official Committee of Unsecured Creditors, and the Debtor's secured creditors have scrutinized the Debtor's budget, including its labor costs, during the course of this Chapter 11. The Debtor does not argue that the Employees' post-petition work did not directly and substantially benefit it.

- 6 -

Paper Mills knowingly assumed the risks and inherent vagaries of withdrawal liability when it agreed to employ union members.

> Without question, the existence of withdrawal liability and its size will depend on how the Fund's assets have fared in the market, how much money has been withdrawn by retired employees, and other actuarial assumptions. But that does not alter the fact that the amount owed to the . . . Pension Fund is based upon Marcal's decision to take advantage of work provided by covered employees. In turn, the portion of that employee work that occurred post-petition was wholly dependent upon DIP Marcal's decision to employ covered teamsters while operating as a debtor-in-possession.

*Ibid*. The Third Circuit's reasoning applies equally here. Cal-Nevada promised to provide the Employees with a certain pension benefit as part of their compensation package. That promise included a contingency if Cal-Nevada withdrew from the Fund – withdrawal liability, which is the statutory mechanism designed by Congress to ensure that employers live up to their end of the defined benefit bargain. *See* 29 U.S.C. §§ 1381, 1391. As the Third Circuit put simply, employers assume those risks "with open eyes" when they agree to provide a defined pension benefit to its employees.[6] *In re Marcal Paper Mills, Inc.*, 650 F.3d at 318.

Stated differently, Cal-Nevada's arguments miss the forest for the trees. While Cal-Nevada's withdrawal liability may be a function of several non-employment related factors, its payment ensures that the Pension Fund will have sufficient funds to keep Cal-Nevada's defined benefit promise to the Employees.

Accordingly, the Application is granted. The court will conduct a status conference on this contested matter on **May 12, 2023 at 11:00 a.m.** to determine a) if the Pension

---

[6] Cal-Nevada's citation to *In re Verity Health Sys. of Cal.*, 633 B.R. 607 (Bankr. C.D. Cal. 2021) is of little value. *In re Verity* dealt with unfunded liability as opposed to withdrawal liability, and it concluded that the unfunded liability was not entitled to administrative priority because it was "better seen as accruing prior to the Petition Date, at the time the Debtors failed to make sufficient contributions to the RPHE, rather than accruing subsequent to the Petition Date, at the time when it became apparent that the Debtors' prior contributions had been inadequate." *Id.* at 618. While the *Verity* court cited to several withdrawal liability cases, those cases addressed (and not surprisingly, denied) priority to withdrawal liability claims attributable to *prepetition* labor. *Id.* at 619.

- 7 -

Fund's demand is an estimate or its final calculation and 2) whether Cal-Nevada intends to object to the amount.

**\*\*\*END OF ORDER\*\*\***

1 Case No. 21-40363 CN

2 <u>**COURT SERVICE LIST**</u>

3

4 California-Nevada Methodist Homes
  P.O. Box 6265
5 Concord, CA 94524

6
  Steven A. Nerger
7 1850 Alice Street
  Oakland, CA 94612
8

9 Other recipients are ECF participants.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 9 -